*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

UNPUBLISHED
March 24, 2022

v

No. 355494
Tuscola Circuit Court
LC No. 20-015173-FC

LARRY E. LYONS,

Defendant-Appellant.

Before: CAVANAGH, P.J., and MARKEY and SERVITTO, JJ.

PER CURIAM.

Defendant appeals by right his jury trial convictions of first-degree premeditated murder, MCL 750.316(1)(a), assault with intent to commit murder, MCL 750.83, second-degree child abuse, MCL 750.136b(3), domestic violence, third offense, MCL 750.81(5), carrying a weapon with unlawful intent, MCL 750.226, and third-degree child abuse, MCL 750.136b(5). The trial court imposed various sentences, including life imprisonment without the possibility of parole for the murder conviction. We affirm.

## I. FACTUAL BACKGROUND

This case arose out of a domestic dispute between defendant and his fiancée, Brandy Dickson, at defendant's residence. They had a daughter together, AL, who was about 10 months old when the fatal altercation occurred on December 15, 2019. Cheryl Hall, Dickson's mother, spoke with Dickson on the telephone that evening and listened as Dickson complained that defendant was being physically abusive and violent. Hall urged Dickson to take AL and leave defendant's home. Hall then heard Dickson tell defendant that she planned to leave, and Hall later heard noises indicating that Dickson was loading up her Chevy Equinox. Hall could tell that defendant was present because Hall heard his voice in the background. Eventually, Hall heard Dickson scream three separate times, "[H]e's got a knife." When the line went dead shortly thereafter, Hall contacted the police.

Upon law enforcement's arrival at the scene, they found Dickson lying in a pool of blood in the yard outside the residence. She was about thirty feet away from her vehicle. The police also discovered a bloody knife in the yard and a trail of blood running from the house to Dickson's

-1-

body. Defendant was inside the home carrying AL, but he did not come outside or explain what happened to Dickson. Police officers eventually determined that Dickson had been stabbed multiple times and arrested defendant. The officers noted that AL appeared ill. A helicopter transported AL to the hospital, and she was treated for a stab wound that pierced her skull and brain. Dickson died as a result of her stab wounds. AL survived but is likely to suffer from cognitive and physical defects for the rest of her life. Defendant waived his *Miranda*[1] rights and spoke with Detective Sergeant Scott Jones on the night of the crime and the next morning. While defendant answered questions, he repeatedly stated that he did not know what happened to Dickson and AL.

Before trial, defendant filed a motion in limine seeking to bar Detective Sergeant Jones, an expert in the field of crime scene investigation, from testifying. The trial court denied the motion. During trial, after Detective Sergeant Jones testified about his qualifications and training, defendant again objected to the detective's testifying as an expert and providing his opinion in the case. The trial court overruled the objection, and Detective Sergeant Jones testified as an expert witness at the end of the six-day trial. Defendant did not testify or present any of his own witnesses. Detective Sergeant Jones stated that after considering all of the evidence, it was his opinion that Dickson had been attacked inside defendant's house while she was holding AL, that she attempted to flee to her vehicle, that she was chased and stabbed in the back, and that Dickson then collapsed from her wounds in the yard. He also opined on redirect examination that there were several moments during the knife assault in which defendant would have had the time to premeditate murdering Dickson. Additional details regarding the testimony of Detective Sergeant Jones are discussed in the analysis section of this opinion.

Deputy Chief Medical Examiner, Dr. Kanu Virani, performed Dickson's autopsy.[2] Dr. Virani testified that Dickson's cause of death was multiple stab wounds and that the manner of death was homicide. Dickson suffered 18 total stab wounds, 10 of which were to her back. According to Dr. Virani, nine of those stab wounds were in a "small, clustered area on the left side [of Dickson's back] from the shoulder to the rib cage," along with one more on the right side of her back. Six of the 10 back wounds entailed entry of the knife into Dickson's body cavity through her rib cage. Dr. Virani testified that the knife perforated Dickson's left lung, heart, aorta, spleen, and one kidney. The stab wounds in Dickson's back were approximately five inches in depth and about ¾ to 1½ inches in width. Dr. Virani opined that the knife had entered her body in a back to front and downward path.

Dr. Virani further stated that there were two stab wounds to the front side of Dickson's torso, one on the left side of her chest immediately below her breast and the other on the left side of her abdomen just below her rib cage. The knife did not enter Dickson's chest cavity, and no internal organs were pierced relative to the abdominal wound. Dr. Virani observed that the six remaining stab wounds were to Dickson's arms. One went all the way through her right forearm, four were on the back side of her left forearm, and one went through the left forearm. Dr. Virani

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[2] We note that Detective Sergeant Jones was present at and observed the autopsy.

described those forearm injuries as defensive wounds, which were caused when Dickson attempted to stop someone from stabbing her.

Dr. Virani opined that Dickson would likely have died as a result of any one of the wounds that pierced her internal organs and aorta. According to Dr. Virani, it was not possible for Dickson to have survived all of the stab wounds together. He was unable to determine the order, or exactly how, the wounds were inflicted, but he concluded that they were consistent with having been made by a single-sided blade matching the knife found in defendant's yard. Dr. Virani also stated that the blood inside defendant's house was consistent with Dickson's being stabbed at least one time in the home and that the wounds to her back could have been made as she was fleeing from someone. Dr. Virani relied on the direction of the back wounds—front to back and downward—as evidence that Dickson was being tailed by someone and stabbed as she moved away. Additionally, Dr. Virani agreed that the wounds to the front of Dickson's body could have been inflicted while she lay on the ground in the yard. Considering that a vast majority of the wounds were on the left side of Dickson's body, Dr. Virani opined that it was possible that she was carrying AL in her right arm when she was stabbed. Although the evidence related to the stab wounds was consistent with the various possibilities or theories touched on by the prosecutor, Dr. Virani clearly indicated that the evidence was not determinative regarding the sequence of events that precipitated and resulted in Dickson's death.

Defendant was convicted by the jury after two hours of deliberation. This appeal ensued.

## II. ANALYSIS

### A. OVERVIEW OF DEFENDANT'S ARGUMENTS ON APPEAL

Defendant contends that the trial court erred by allowing Detective Sergeant Jones to testify as an expert witness in crime scene investigation. Defendant argues that his opinion testimony was not relevant because it did not assist the jurors in understanding the evidence or in determining any factual issues. Defendant further maintains that the detective's opinion testimony was not admissible because it was not based on sufficient facts and was not the product of reliable scientific principles and methods. The preceding arguments are based on MRE 702. Next, defendant asserts that even if Detective Sergeant Jones's opinion testimony were admissible under MRE 702, it was far more prejudicial than probative and thus inadmissible under MRE 403. Defendant additionally claims that assuming that Detective Sergeant Jones was properly qualified as an expert, his testimony inappropriately usurped the role of the jury by offering an opinion on the ultimate issue in the case, i.e., whether the killing was premeditated and deliberate. Defendant also contends that the detective's opinion testimony effectively and wrongfully vouched for Hall's credibility. Defendant argues that the introduction of Detective Sergeant Jones's opinion testimony was not harmless and requires reversal. To the extent that certain arguments on appeal were not preserved, defendant maintains that his attorney was ineffective for failing to raise the necessary objections. Finally, defendant asserts that there were multiple instances of prosecutorial misconduct or error.

### B. PRESERVATION AND STANDARDS OF REVIEW

Some of defendant's arguments on appeal were preserved and others were not. "To preserve an evidentiary issue for review, a party opposing the admission of evidence must object

at trial and specify the same ground for objection that it asserts on appeal." *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019). Preserved evidentiary issues are reviewed for an abuse of discretion. *Id.* at 251. A trial court abuses its discretion when its decision falls outside the range of principled outcomes, and a ruling on a close evidentiary issue ordinarily cannot constitute an abuse of discretion. *Id.* at 251-252. The determination whether to admit testimony frequently involves preliminary questions of law, e.g., whether a rule of evidence bars admission, and questions of law are reviewed de novo. *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999). With respect to preserved issues generally, "[n]o judgment or verdict shall be set aside or reversed or a new trial be granted by any court of this state in any criminal case, on the ground of . . . the improper admission . . . of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice." MCL 769.26. "We generally review de novo claims of prosecutorial misconduct on a case-by-case basis, in the context of the issues raised at trial, to determine whether a defendant was denied a fair and impartial trial." *People v Fyda*, 288 Mich App 446, 460; 793 NW2d 712 (2010).

We review unpreserved arguments for plain error affecting substantial rights. *People v Jones*, 468 Mich 345, 356; 662 NW2d 376 (2003). To avoid forfeiture of the claim, a defendant must show that "(1) [an] error occurred, (2) the error was plain, i.e., clear or obvious, and (3) the plain error affected substantial rights." *Id.* at 355. "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). Even upon satisfaction of these three requirements, "[r]eversal is warranted only when the plain, unpreserved error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity, or public reputation of judicial proceedings independent of the defendant's innocence." *Jones*, 468 Mich at 355. Whether counsel was ineffective presents a mixed question of fact and constitutional law, and factual findings are reviewed for clear error, whereas questions of law are reviewed de novo. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). When the trial court, as in the instant case, does not conduct an evidentiary hearing relative to an issue of ineffective assistance of counsel, our review is "limited to mistakes apparent on the record." *Fyda*, 288 Mich App at 460.

## C. DISCUSSION AND RESOLUTION OF ARGUMENTS RELATED TO THE OPINION TESTIMONY OF DETECTIVE SERGEANT JONES

Defendant first argues that the trial court abused its discretion by allowing Detective Sergeant Jones to testify as an expert witness in the area of crime scene investigation in relation to various opinions the detective offered at trial. MRE 702 provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

"MRE 702 establishes prerequisites for the admission of expert witness testimony." *People v Kowalski*, 492 Mich 106, 119; 821 NW2d 14 (2012). "MRE 702 incorporates the standards of reliability that the United States Supreme Court established in *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993), in interpreting the equivalent federal rule of evidence." *People v Muhammad*, 326 Mich App 40, 51-52; 931 NW2d 20 (2018), citing *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 781-782; 685 NW2d 391 (2004). "The court may admit evidence only once it ensures, pursuant to MRE 702, that expert testimony meets that rule's standard of reliability." *People v Lane*, 308 Mich App 38, 52; 862 NW2d 446 (2014) (quotation marks, citations, and brackets omitted). In *Kowalski*, 492 Mich at 120-122, our Supreme Court elaborated:

> [A] court evaluating proposed expert testimony must ensure that the testimony (1) will assist the trier of fact to understand a fact in issue, (2) is provided by an expert qualified in the relevant field of knowledge, and (3) is based on reliable data, principles, and methodologies that are applied reliably to the facts of the case. Although these considerations are separate and distinct and must each be satisfied independently, they are, in fact, overlapping in nature. For example, an expert who lacks knowledge in the field at issue cannot assist the trier of fact. Likewise, expert testimony without a credible foundation of scientific data, principles, and methodologies is unreliable and, thus, unhelpful to the trier of fact. Indeed, proposed expert testimony must meet all the other requirements of MRE 702 in order to assist the trier of fact to understand the evidence or to determine a fact in issue.
>
> However, the threshold inquiry—whether the proposed expert testimony will assist the trier of fact to understand the evidence or to determine a fact in issue—is also not satisfied if the proffered testimony is not relevant or does not involve a matter that is beyond the common understanding of the average juror. Interpreting the nearly identical language in the federal counterpart to MRE 702, the United States Supreme Court explained that helping the trier of fact to understand the evidence or to determine a fact in issue presents a question of relevance because expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful. Similarly, if the average juror does not need the aid of expert interpretation to understand a fact at issue, then the proffered testimony is not admissible because it merely deals with a proposition that is not beyond the ken of common knowledge. These considerations of relevancy and the need for expertise are independent of the other requirements of MRE 702. Thus, even proposed expert testimony that is offered by a qualified expert and based on reliable scientific data and methods may be properly excluded if it is not relevant to the facts of the case or is offered for a proposition that does not require the aid of expert interpretation. [Quotation marks, citations, brackets, and ellipses omitted.]

Defendant's initial argument under MRE 702 is that Detective Sergeant Jones's opinion testimony did not assist the jury in understanding a fact in issue because it was merely observational in nature and concerned matters for which the average juror did not need the aid of

expert interpretation to understand. Stated otherwise, according to defendant, the detective's challenged testimony dealt with propositions that were *not* beyond the ken of common knowledge.

We first note that Detective Sergeant Jones testified that he had investigated thousands of crime scenes since 1996, that he had been trained in crime scene investigation, evidence collection and processing, and crime scene photography, that he is a certified evidence technician, and that he holds the title of Medical Examiner Special Investigator (MESI), which requires proficiency related to "the collection and preservation of evidence specifically pertaining to deaths." Detective Sergeant Jones had been trained by Dr. Virani, who, as indicated earlier, conducted Dickson's autopsy with the detective by his side. Detective Sergeant Jones's role as a MESI required him to go to murder scenes to collect evidence for county medical examiners when they could not attend in person. He analyzed crime scenes involving deaths, gathering all relevant and material evidence pertaining to a homicide. Detective Sergeant Jones had attended more than 400 autopsies in his career. He was also experienced in interviewing criminal suspects and other witnesses, performing between 300 and 600 such interviews per year.

At trial, Detective Sergeant Jones first discussed the implication of the wounds Dickson sustained and defendant's complete lack of wounds. Detective Sergeant Jones noted that Dickson had knife wounds on her forearms. He described them as defensive wounds, i.e., that they were likely sustained while she was trying to block a knife from reaching areas of the body that if struck would probably result in serious injury or death. We note, as indicated earlier, that Dr. Virani also opined that the forearm wounds were defensive in nature. Detective Sergeant Jones testified that he viewed defendant's body after his arrest, finding no visible defensive wounds or any fresh injuries whatsoever. He explained to the jury that this evidence was consistent with defendant's being the aggressor.

The opinion testimony was plainly relevant to the murder prosecution. And while the existence of the wounds to Dickson's forearms and the lack of similar wounds to defendant were observational, Detective Sergeant Jones's opinion that Dickson's wounds were defensive in nature and probative of who was the aggressor went beyond the ken of common knowledge. See *Caldwell v State*, 245 Ga App 630, 633; 538 SE2d 531 (2000) ("In this case, it was permissible for the officer to testify about her observations of the victim's wounds, to make an inference based on her training and on her observations of the wounds, and to opine that the victim's wounds were consistent with 'defensive' ones, a conclusion that is beyond the ken of the average layman.").

Next, Detective Sergeant Jones addressed the stab wounds Dickson sustained to her back, which included several that involved the knife's penetrating her back, going through her rib cage, and piercing multiple vital organs. The detective observed that the knife wounds were about five inches deep, consistent with Dr. Virani's testimony, which would have required a great deal of force to make using the bloody knife found at the scene of the crime. Upon consideration of the nature of the wounds and the type of knife found at the scene, including the length of its blade, Detective Sergeant Jones opined that the wounds suffered by Dickson could indeed have been caused by that particular knife. The amount of force required to inflict the five-inch-deep wounds through use of the knife and the question whether the knife found at the scene could have caused the wounds most certainly required the aid of expert interpretation. A lay witness could not have testified on such matters, and they were beyond the ken of the average juror. Additionally, Detective Sergeant Jones's opinion was relevant to a material issue at trial, because the location

and depth of the knife wounds and the force needed to make them supported the proposition that defendant intended to kill Dickson. See *People v Bolden*, 29 Cal 4th 515, 561; 58 P3d 931; 127 Cal Rptr 2d 802 (2002).[3] Furthermore, the detective's opinion that the knife found at the scene could have caused Dickson's wounds was relevant to defendant's identity as the perpetrator given that the knife was from a set of knives found inside defendant's residence. See *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008) ("[I]t is well settled that identity is an element of every offense.").

Lastly, defendant challenges Detective Sergeant Jones's expert opinions regarding how the crime transpired or took shape. Detective Sergeant Jones testified that he reached his opinions regarding the events leading up to Dickson's death and AL's injury after reviewing all of the evidence in the case. He cited Hall's testimony about the telephone call in which she overheard an argument between Dickson and defendant, followed by silence, and then screams from Dickson that someone had a knife. Detective Sergeant Jones also noted that Hall stated that she heard defendant's voice during the telephone call, that she had instructed Dickson to leave the residence with AL, and that she heard noises indicating that Dickson was loading up her vehicle in preparation to leave. Detective Sergeant Jones further considered the fact that Dickson's vehicle was idling with the hatch open when officers first arrived on the scene, with Dickson lying about 30 feet away from the Equinox. He additionally referred to the trail of blood running between the house and her body and to the presence of blood splatter on the walls inside the home.

Relying on this and other evidence, including the autopsy findings, Detective Sergeant Jones testified to the following opinions: the knife assault had started inside the house; Dickson was first stabbed on the front of her body given the type of knife wounds to her forearms, chest, and abdomen (nonfatal); she fled outside in an attempt to escape in her vehicle, as revealed by the trail of blood; Dickson was chased and stabbed multiple times in the back, resulting in the perforation of vital organs; and she collapsed from her wounds before reaching the Equinox. On cross-examination, Detective Sergeant Jones acknowledged that he could not specifically state how many stab wounds Dickson sustained inside the home, nor the complete sequence in which the wounds were inflicted. But he was confident that the wounds to the front of her body occurred before Dickson was stabbed in the back, noting that it was human nature to run from someone attacking you with a knife.

Once again, Detective Sergeant Jones's testimony regarding the existence, nature, and location of the stab wounds, the blood on the walls of the house, the trail of blood, the idling

---

[3] The California Supreme Court ruled:

> Here, the victim died from a single stab wound to the back that penetrated the victim's lungs and spleen. The stab wound was five inches long and five to six inches deep. At the scene of the killing there were no signs of a struggle or evidence of a quarrel. In plunging the knife so deeply into such a vital area of the body of an apparently unsuspecting and defenseless victim, defendant could have had no other intent than to kill.

vehicle, and the location of Dickson's body was observational in nature. But his explanation, based on his extensive experience as a crime scene investigator and MESI, with respect to how all of the evidence could be tied together and used to essentially reconstruct the crime was generally "beyond the ken of common knowledge." While we do believe that it is a close call, we cannot conclude that the trial court erred by determining that the aid of expert interpretation was required.[4] Accordingly, we hold that Detective Sergeant Jones's opinions assisted the triers of fact in understanding the evidence and in determining facts in issue.

This is not to say that the detective's opinions were necessarily accurate; they were subject to scrutiny, and we have no way to tell whether the jurors accepted his views on how the criminal episode evolved. Moreover, as will be discussed shortly, we conclude that any error with respect to the admission of one, some, or all of Detective Sergeant Jones's opinions on how events played out was not prejudicial, whether under plain-error or harmless-error review.

Next, defendant argues that Detective Sergeant Jones's various expert opinions were inadmissible because they were not based on reliable principles and methodologies. Defendant points to the opinions referenced above, plus testimony by Detective Sergeant Jones that at various times during the criminal transaction defendant had the opportunity to premeditate the murder. Defendant complains that the detective's opinion testimony was "purely observational in nature and not grounded in the methods and procedures of science." Defendant acknowledges that "expert testimony can be based on experience or observation alone; but only where the conclusion to which the expert opines can reliably be drawn from observational data." Defendant contends that the testimony by Detective Sergeant Jones had no credible foundation in scientific methodology and that the trial court did not require the prosecutor to establish a foundation for the detective's assertions. Defendant maintains that Detective Sergeant Jones's opinions were not supported by scientific studies, experiments, or literature, which could have shown, in part, rates of error.

MRE 702 requires opinion testimony to be supported by "reliable principles and methods." "[I]n the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error[.]" *Daubert*, 509 US at 594. But, according to the United States Supreme Court, "[t]he inquiry envisioned . . . is, we emphasize, a flexible one." *Id.* In the context of the instant case, the particular opinions expressed by Detective Sergeant Jones concerned (1) whether wounds were defensive in nature, (2) the amount of force needed to produce a five-inch-deep knife wound, (3) matching a specific knife to a wound, and (4) the sequence of events, as deciphered on the basis of blood splatter, the location and nature of knife wounds, the blood trail leading to the body, and the testimony of a witness who heard events transpire over the phone. Applying a flexible approach and considering the character of the detective's opinions, we conclude that the reliability of underlying principles and methods is most accurately assessed by considering the extent and relevancy of Detective Sergeant Jones's skill, experience, training, and knowledge. Moreover, the detective not only had extensive training and experience as a crime scene

---

[4] It is a close call because we imagine that some jurors would have been able to connect all of the dots, i.e., the individual pieces of evidence and, without the aid of an expert, reached the same conclusions as Detective Sergeant Jones.

investigator relative to evidence collection, processing, and evaluation, including in murder cases, he was also a MESI, attending more than 400 autopsies in his career. As an example, even if the prosecution did not submit evidence of scientific studies, experiments, and literature discussing the amount of force needed to produce a five-inch-deep knife wound with the type of knife used in this case, assuming they even exist, the reliability of Detective Sergeant Jones's opinion on the subject could be demonstrated by his knowledge of human anatomy as gleaned from MESI training and attending autopsies along with his experience investigating crimes involving knife wounds. We cannot conclude that the trial court erred by admitting the detective's opinions under MRE 702.[5]

Moreover, even were we to assume the court erred in admitting the opinions given by Detective Sergeant Jones, we find it did not result in a miscarriage of justice, MCL 769.26: It was not outcome-determinative, *Lukity*, 460 Mich at 495, and it was not prejudicial, *Carines*, 460 Mich at 763. First, the circumstantial evidence overwhelmingly established that defendant was the perpetrator.[6] Second, the location, number, depth, and nature of Dickson's knife wounds, the lack of injuries sustained by defendant, the testimony of Hall, and the description of the crime scene, all clearly showed that defendant intended to kill Dickson, that the killing was premeditated and deliberate, and that defendant was the aggressor and did not act in self-defense. Therefore, even absent the detective's opinion testimony, we are confident that defendant would still have been convicted for all the offenses at issue.

Defendant next argues that even if Detective Sergeant Jones's opinion testimony was properly admitted under MRE 702, the testimony should have been excluded under MRE 403. MRE 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

First, reversal is unwarranted in light of our harmless-error analysis; any error was not prejudicial. Moreover, the nature of defendant's argument that the probative value of the opinion testimony was substantially outweighed by the danger of the testimony misleading the jury is essentially a regurgitation of his argument that the evidence was excludable under MRE 702, which we have already rejected for the reasons stated earlier. Defendant fails to otherwise identify how the specific expert testimony of Detective Sergeant Jones misled the jury or resulted in unfair prejudice let alone demonstrate that the probative value of the evidence was *substantially outweighed* by the danger of unfair prejudice or misleading the jury.

Defendant next challenges that portion of Detective Sergeant Jones's testimony elicited during redirect examination that defendant had the time to premeditate Dickson's murder. Specifically, defendant contends that Detective Sergeant Jones's statements about defendant's

---

[5] We separately discuss below Detective Sergeant Jones's "premeditation" opinion testimony.

[6] Additionally, there was trial testimony that when defendant's preliminary examination ended, defendant spontaneously told an officer, "I'm not denying what I did, but they're making me out to look like a monster with my child."

opportunities to premeditate the murder usurped the role of the jury by providing an opinion regarding an issue that ultimately was to be decided by the jury. "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." MRE 704. "Nevertheless, there are limits on an expert's authority to offer an opinion that embraces an ultimate issue[.]" *People v McFarlane*, 325 Mich App 507, 519; 926 NW2d 339 (2018). For example, expert witnesses "may not express an opinion regarding the defendant's guilt or whether the defendant had a culpable state of mind, or testify about the requirements of law which apply to the particular facts in the case or to phrase his opinion in terms of a legal conclusion." *People v Zitka*, 335 Mich App 324, 345-346; 966 NW2d 786 (2020) (quotation marks, citations, and brackets omitted).

During cross-examination of Detective Sergeant Jones, defense counsel asked if there had been any evidence expressly showing that defendant had planned to kill Dickson. The detective indicated that there was no documentary proof, such as written plans to commit the murder. Detective Sergeant Jones clarified, however, that such evidence was incredibly rare. Then, during redirect examination of the detective, the prosecutor elicited testimony that there were moments during the criminal transaction in which defendant would have had the opportunity to reconsider, or contemplate his actions, i.e., premeditate the murder. Detective Sergeant Jones also acknowledged evidentiary standards for proving premeditation. Defendant devotes a great deal of attention to arguing that he did not open the door to the challenged testimony. We find it unnecessary to address this aspect of his argument.

Detective Sergeant Jones did not opine that defendant was guilty or that he actually premeditated Dickson's murder; he spoke in terms of opportunities, indicating that defendant *could have* premeditated the murder during certain time periods that matched the detective's opinions on how the crime had developed and transpired. Again, it is a close call whether Detective Sergeant Jones had expertise beyond the ken of common knowledge with respect to identifying an opportunity to premeditate the murder. But the detective's expertise as a MESI and crime scene investigator was adequate to avoid a violation of MRE 702. That said, Detective Sergeant Jones improperly testified about the requirements of law applicable to the facts of the case, i.e., the legal principles concerning premeditation. Nevertheless, assuming error in that regard, we conclude that the trial court's instructions on premeditation paralleled the detective's testimony, and, more importantly, for the reasons elaborated upon earlier, we find the requisite prejudice simply cannot be established. Consequently, reversal is unwarranted.

Next, defendant argues that Detective Sergeant Jones improperly vouched for the credibility of witness Hall. "It is generally improper for a witness to comment or provide an opinion on the credibility of another witness, because credibility matters are to be determined by the jury." *People v Dobek*, 274 Mich App 58, 71; 732 NW2d 546 (2007). Defendant identifies the following testimony by Detective Sergeant Jones as vouching for Hall's credibility:

> By the time I had arrived at the scene, I had already been receiving information that Brandy's mom [Hall] had contacted 911 in Washtenaw County based on a phone call from her daughter. I learned that part of that phone call entailed Brandy telling her mother that he had a knife and that [Hall] had made statements that she had told Brandy to just grab the child and get out of there. So the fact that the car was out there running, warming up on a cold evening would

lend credibility to those statements and corroborate what she had said about the fact that Brandy was getting ready to leave the residence.

Detective Sergeant Jones was then asked, "Is that what you're doing every step of the way through an investigation, trying to corroborate or refute information that's being presented to you?" Detective Sergeant Jones answered, "Yes."

Upon reviewing Detective Sergeant Jones's challenged testimony, we note that he never stated that he believed Hall was a credible witness at trial or that she was telling the truth. Instead, the detective simply indicated that the evidence from the scene of the crime corroborated Hall's statements about what she had heard during her telephone call with Dickson. We conclude that there was no error.

Defendant's final argument with respect to the testimony of Detective Sergeant Jones is that trial counsel was ineffective for not lodging objections on all of the grounds addressed above. In regard to the issues upon which we held that the trial court did not abuse its discretion or otherwise err, the ineffective assistance claim is rejected because counsel is not ineffective for failing to raise a futile or meritless objection. *People v Wang*, 505 Mich 239, 253 n 22; 952 NW2d 334 (2020) (quotation marks and citation omitted). Moreover, defendant has failed to establish the requisite prejudice, i.e., he cannot show the existence of a reasonable probability that, but for counsel's assumed errors, the result of the proceedings would have been different. *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001). The evidence of defendant's guilt was overwhelming.

## D. PROSECUTORIAL MISCONDUCT

Defendant asserts several instances of prosecutorial misconduct and that trial counsel was ineffective for failing to object to them.

Defendant initially alleges prosecutorial misconduct because he believes that during the trial, the prosecutor elicited improper testimony from Detective Sergeant Jones and Dr. Virani. "A prosecutor's good-faith effort to admit evidence does not constitute misconduct." *Dobek*, 274 Mich App at 70 ("The victim's testimony was somewhat equivocal, and we do not view the prosecutor's effort to refresh her memory as a bad-faith effort to admit evidence, as the evidence was arguably admissible."). With respect to Detective Sergeant Jones, defendant claims prosecutorial misconduct because the prosecution elicited the detective's opinion testimony, which was inadmissible. In light of our ruling earlier in this opinion, we conclude that there was no prosecutorial misconduct. The opinion testimony was either admissible or presented such a close call that we cannot find that the prosecution acted in bad faith; admissibility was patently arguable.

With respect to Dr. Virani, the prosecution asked a series of questions regarding whether certain theorized circumstances relative to the crime scene and the events that transpired were consistent with the injuries and autopsy findings. Dr. Virani generally answered in the affirmative, but he also testified that he could not definitively state that the events actually developed as theorized by the prosecution. Defendant contends that the prosecutor's questioning was intended to elicit "impermissible testimony" from Dr. Virani. Defendant alleges that the prosecutor engaged in "improper tactics," arguing that prosecutors "may not elicit testimony from experts that violates

the rules of evidence . . . ." Defendant, however, fails to identify any rule of evidence that was allegedly violated, nor does he specifically identify the "tactics" used by the prosecutor that were purportedly "impermissible." Instead, defendant merely compares the questions asked of Dr. Virani to the examination of Detective Sergeant Jones. The record reveals that the prosecutor made good-faith efforts to elicit admissible testimony from Dr. Virani, and defendant has not presented us with any pertinent argument or evidence to the contrary. Thus, we conclude that reversal is unwarranted.

Next, defendant argues that the prosecutor committed misconduct by asking questions regarding defendant's silence and then commenting on the silence, thereby violating his constitutional right to remain silent under the Fifth Amendment. First, defendant contends that the prosecutor erred or committed misconduct by referencing defendant's failure to answer questions posed by two officers who were the first individuals to arrive at the crime scene. In pertinent part, defendant told the officers that he did not know what had happened to Dickson or why she was bleeding. Eventually, defendant stopped responding at all when the officers asked him why Dickson was bleeding in the yard. During closing argument, the prosecutor remarked that defendant "stood in his house and looked out and provided little to no useful information" and that he "provided no information as to how or why Brandy was laying [sic] in his yard with mortal stab wounds." The prosecutor further commented: "He knew. He full well knew. He simply wouldn't say it."

"A defendant's constitutional right to remain silent is not violated by the prosecutor's comment on his silence before custodial interrogation and before *Miranda* warnings have been given." *People v McGhee*, 268 Mich App 600, 634; 709 NW2d 595 (2005). In this case, when the police officers first spoke to defendant, they were at the scene in response to a 911 call to render medical aid. At the time of the conversation with defendant, they were not aware that Dickson or AL had been stabbed. The officers were not talking to defendant in the context of a custodial interrogation, nor is there any indication in the record that defendant was invoking any right to remain silent. Moreover, making the statement that he did not know what happened is not equivalent to defendant's being silent. Consequently, there was no prosecutorial misconduct or error.

Second, defendant contends that the prosecutor committed misconduct by commenting on his silence after he had been arrested and read his *Miranda* warnings.

> A defendant's right to due process guaranteed by the Fourteenth Amendment is violated where the prosecutor uses his postarrest, post-*Miranda* warning silence for impeachment or as substantive evidence unless it is used to contradict the defendant's trial testimony that he made a statement, that he cooperated with police, or that trial was his first opportunity to explain his version of events. [*People v Solmonson*, 261 Mich App 657, 664; 683 NW2d 761 (2004), citing *Doyle v Ohio*, 426 US 610, 619 n 11; 96 S Ct 2240; 49 L Ed 2d 91 (1976).]

"A reference to a defendant's post-arrest, post-*Miranda* silence generally constitutes a *Doyle* violation unless the reference was so minimal that silence was not submitted to the jury as evidence from which it was allowed to draw any permissible inference[.]" *People v Shafier*, 483 Mich 205, 217-218; 768 NW2d 305 (2009) (quotation marks and citation omitted).

In this case, the parties do not dispute that defendant was read his *Miranda* rights and properly waived them before Detective Sergeant Jones commenced any custodial interrogation. With respect to the two interviews that were conducted, the detective testified that defendant never provided an explanation in regard to what had transpired. Instead, defendant simply stated that he did not know what happened to Dickson and AL. During closing argument, the prosecutor discussed and commented on defendant's failure to explain what had occurred and his claim that he did not know what happened to Dickson and AL.

Defendant insists that the prosecutor's questioning and closing argument were specific and harmful references to defendant's silence, violating his constitutional right to remain silent under the Fifth Amendment. We disagree. Importantly, even after being provided *Miranda* warnings, defendant chose to waive his right to remain silent and spoke with Detective Sergeant Jones on two separate occasions. There is nothing in the record to suggest that defendant ever changed his mind about exercising his right to remain silent, asserted the right, or ended the interviews. Instead, defendant answered Detective Sergeant Jones's questions; he simply did so in a manner that did not provide any useful explanation regarding what happened to Dickson and AL, despite overwhelming evidence that defendant was home when they were stabbed. A "defendant's right to due process is implicated only where his silence is attributable to either an invocation of his Fifth Amendment rights or his reliance on the *Miranda* warnings." *Solmonson*, 261 Mich App at 664-665. Here, defendant's so-called "silence" is more accurately a verbal expression of lack of knowledge. And to the extent that "silence" was involved, we find nothing whatsoever in the record to indicate that it was attributable to defendant's invocation of his Fifth Amendment right or his reliance on the *Miranda* warnings. Consequently, there was no prosecutorial misconduct or error. And we likewise reject defendant's accompanying argument that trial counsel was ineffective for failing to object to the alleged instances of prosecutorial misconduct because counsel is not ineffective for failing to raise a futile or meritless objection. *Wang*, 505 Mich at 253 n 22.

Furthermore, in light of the overwhelming evidence of guilt, assuming for the sake of argument that there was any prosecutorial misconduct or error as alleged, we find it did not result in a miscarriage of justice, MCL 769.26; it was not outcome-determinative, *Lukity*, 460 Mich at 495; it was not prejudicial, *Carines*, 460 Mich at 763, and it did not give rise to a reasonable probability that but for counsel's assumed errors the result of the proceedings would have been different, *Carbin*, 463 Mich at 600.

We affirm.

/s/ Mark J. Cavanagh
/s/ Jane E. Markey
/s/ Deborah A. Servitto

-13-